THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
MIGUEL ROSARIO, Appellant.

First Department, April 23, 1987

**APPEARANCES OF COUNSEL**

*Joel B. Rudin* for appellant.

*Mark Cammack* of counsel *(Donna Krone* with him on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

### OPINION OF THE COURT

SULLIVAN, J. P.

John Figueroa, the owner, and his 17-year-old son, Tares Figueroa, were both present in "Ours After Hours", a social club located on the Lower East Side of Manhattan, on May 16, 1982 at approximately 5:00 A.M., when defendant, three other Hispanic men and two women entered. Diana Cortes, the barmaid, was behind the bar and Jose Vega, the disc jockey, was inside a booth playing records. Between 10 and 20 patrons, including Nilda Fonseca and Lucy Lallave, were also present. The club was lit with recessed red and blue lights, and light reflected off a revolving multifaceted ball hung from the ceiling. Although dim, these lights provided enough illumination for the occupants to recognize each other.

Defendant, one of the other men in the group and the two women took seats at two tables. Another, whom Cortes identified to Tares as "Frankie", stood at the bar, talking to Figueroa. The fourth man stood between Figueroa and Frankie, but did not participate in the conversation. Figueroa and Frankie spoke for about an hour. For most of this time, Tares was sitting at the end of the bar, about three feet away. Although Tares could not overhear the conversation, he knew that Frankie, whom he had heard about from his brother, had paid his father $10,000 to purchase the club, but that something had "happen[ed] to [the] deal" and Frankie wanted his money back.

At some point, Cortes told Tares that she had seen guns being passed back and forth between the members of defendant's group. As a result, Tares, whose duty it was to watch the door and be on the lookout for weapons, paid particular attention to defendant and his companions. At another point, one of the men spoke to Cortes, and gave her a note with "311 E. 105" and the name "Mike" written on it, explaining that this was the address of his club and inviting her to visit him there. At the time, defendant, who was known by the name "Mike", ran a social club at that address. Interestingly, Cortes was never asked at trial whether the man who handed her the note was defendant. Presumably, she would have been unable to make an identification.

At about 6:00 A.M., Figueroa and Frankie, after shaking hands, walked toward the exit. Defendant and the other four members of the group joined them. At the time, Lallave was in the disc jockey booth with Vega, while Fonseca was seated at the bar facing away from the exit. Tares, who was still seated at the corner of the bar, watched his father, Frankie and the others in his group walk through the doorway and disappear into a small foyer. Defendant, however, remained inside the club, leaning against the wall and facing the door leading to the foyer.

About a minute or so after Figueroa and defendant's companions walked through the doorway, shots rang out from inside the foyer, followed by a brief pause, and then several more shots. Cortes, Vega and Lallave, each of whom immediately ducked for cover, did not see anything. Fonseca, who was pushed to the floor by a man sitting next to her, heard only one shot and saw the flash of a gunshot. Tares, who was still seated at the end of the bar facing the exit when the first shots rang out, saw light coming through the open inner door, which indicated that the outside door to the street was also open. He then saw defendant pull out a gun, approximately four inches long, and fire it into the foyer. At that point, someone grabbed Tares and pulled him behind the bar.

When the shooting stopped, Tares, Lallave and Fonseca ran out to the foyer, where they found Figueroa slumped against the wall, bleeding badly. Defendant and his companions were gone. The police were called. Figueroa was taken by ambulance to Bellevue Hospital, where he was pronounced dead. A number of shell casings and pieces of deformed lead were recovered from the floor of the foyer where Figueroa had been shot. Three bullets were removed from the walls and the floor near the club entrance. One of them had passed through the inner door and embedded itself in the wall at such an angle as to indicate that it had been fired from inside the club. While the officers were able to lift latent fingerprints from two beer bottles and a whiskey glass said to have been handled by members of defendant's party, none of them matched defendant's fingerprints, or those of Frankie or of a man later identified as Israel Mendez.

An autopsy performed later that day revealed that Figueroa had sustained 13 gunshot wounds to the chest, abdomen and extremities. Five of the wounds, one to the right shoulder and four to the left arm, had powder burns, indicating that the

shots had been fired from a distance of from 12 to 18 inches. A ballistics technician concluded that Figueroa had been shot with bullets fired from at least three guns, one .380 caliber automatic, and two .38 caliber revolvers.

After viewing photograph arrays on June 14, 1982 and again on August 19, 1982, Tares Figueroa chose a photograph of Efrain Ruiz from both arrays and identified him as Frankie.[1] In a lineup conducted on August 25, 1982, Tares also identified Israel Mendez as the person who had been sitting at a table with defendant and the two women.[2] Defendant was arrested on August 25, 1982 and, early the next morning, placed in a lineup with four stand-ins. Viewing the lineup from behind a one-way mirror, Tares identified him as the man who had fired a gun from inside the club into the foyer. Tares also identified defendant at trial. He was the only witness to do so.

On basis of interviews of witnesses, the members of defendant's group, consisting of four men and two women, were described in two police reports as perpetrators No. 1 through No. 6. Defendant, the wielder of a "big gun", was designated as perpetrator No. 3 and described in both reports as a male Hispanic with long straight hair, 26 years old, 5 feet 6 inches tall and weighing 130 pounds. A photograph of defendant standing beside a measuring stick, taken at the time of his arrest, indicated that he was 5 feet 5 inches tall and, while he weighed 130 pounds, he was 37 years old. Although there were several other eyewitnesses to the crime, one of whom, Freddy Santiago, had seen "the whole thing," the police, despite repeated attempts, were unsuccessful in their efforts to subpoena them for trial.

Defendant's case consisted solely of the playing for the jury of the song which was being played, presumably loudly, in the club at the time of the shooting, as well as a recording of the 911 calls received by the police as a result of the incident. In his summation, defense counsel challenged the reliability of Tares Figueroa's identification of defendant, pointing to the dim lighting conditions at the club and stressing the significant age discrepancy between defendant's actual age, 37, and the witnesses' description of him as 26. He also focused on

---

1. Defendant elicited this evidence on cross-examination.

2. In summation, the prosecutor was to tell the jury that Mendez had not been indicted because Tares Figueroa did not see him at the time of the shooting.

Cortes' failure to identify defendant as the "Mike" who had given her the note, the failure to subject the note to handwriting analysis and the absurdity of the notion that the killer would leave a calling card at the scene of the crime. After a day of deliberations, including a reading of certain testimony, and overnight sequestration, the jury, without any further requests, returned a verdict early the next day of guilty of murder in the second degree.[3]

Of the many contentions raised on appeal, the only one that concerns us involves the testimony by Detective Tarosian, the People's final witness, that Tares Figueroa had identified an additional suspect, Israel Mendez, at a separate lineup conducted the same evening as the one in which defendant was identified. Defense counsel vigorously objected to this testimony, arguing, "It's bolstering * * * trying a case which isn't before the court * * * opening the door to a whole lot of collateral testimony which has no business being in this trial." Notwithstanding this objection, a picture of the Mendez lineup was received in evidence and the prosecutor thereafter proceeded to elicit the details of that proceeding. He was also permitted on redirect examination to show that Mendez' appearance at the time of his arrest, i.e., height, weight, age and "one bad eye"—he was blind in the right eye—closely matched the postshooting description of perpetrator No. 4 given by two of the eyewitnesses. Later, in his summation, the prosecutor, implicitly stressing the accuracy of this identification, referred to Mendez as perpetrator No. 4 no less than seven times. We believe that this evidence was improperly received and was so prejudicial to defendant as to deny him a fair trial and to warrant reversal and a new trial.

It has long been the New York rule that, absent a situation covered by CPL 60.25,[4] a witness may not testify at trial to having overheard an eyewitness make a pretrial identification of the defendant. *(People v Trowbridge,* 305 NY 471; *People v Caserta,* 19 NY2d 18.)* Indeed, prior to the 1927 adoption of section 393-b of the Code of Criminal Procedure, the predeces-

3. Although the indictment did not charge defendant with acting in concert in the commission of the homicide, the court, over defendant's objection, instructed the jury on accessorial conduct.

4. CPL 60.25 permits a witness, under certain prescribed circumstances, to testify to another person's postcrime identification of the defendant where the identifying witness is "unable at the [trial] to state, on the basis of present recollection, whether or not the defendant is the person in question".

sor to CPL 60.25 and 60.30, even the eyewitness could not testify to his own previous in-person identification of an accused. *(See, People v Caserta, supra,* at 21.)* The rationale underlying *Trowbridge* is twofold. Such evidence is hearsay. Moreover, it improperly bolsters the identification testimony of the eyewitness since the mere repetition of the identification by a third party has the potential of placing disproportionate emphasis on the identification and to influence the jury unduly with respect to its reliability. *(See, People v Bolden,* 58 NY2d 741, 743 [Gabrielli, J., concurring].) Bolstering an eyewitness' identification, it has been noted, "by calling a succession of witnesses who swear that they saw and heard him identify the same person upon previous occasions * * * tends to give the idea to a jury that there is an impressive amount of testimony to identification when such is really not the fact." *(People v Caserta, supra,* 19 NY2d, at 21.)

The same evils which *Trowbridge (supra)* and its progeny sought to avoid were realized in this case through Detective Torosian's testimony concerning the Israel Mendez lineup. This testimony, stressing as it did the accuracy of the identification of perpetrator No. 4, Mendez, by Tares Figueroa, the only witness who could identify defendant, could not help but bolster that same witness' identification of defendant, and was undoubtedly elicited with that design. As the prosecutor, paraphrasing Tares, told the jury in summation, "Mendez was there. He was part of the group, but I could not see him. There was the wall of the vestibule." Mendez, who had not been indicted and who was not on trial, was not present to challenge the accuracy of his lineup identification. Nor was defense counsel in any position to do so. It should be noted that the prosecutor, prior to Torosian's testimony about the Mendez lineup, had failed even to turn over a photograph of that lineup to defense counsel. (A mistrial application on this point was denied.) Moreover, the court at the *Wade* hearing precluded defense counsel from inquiring about the conduct of the Mendez lineup, reasoning that that lineup was irrelevant to this case.

Thus, the prosecution was able not only to suggest, without challenge, that Tares Figueroa's identification of Mendez was accurate, but also to enhance Tares' general credibility as an identification witness. If he accurately identified perpetrator No. 4, who had been sitting at a table and was not observed firing a weapon, then, inferentially, his identification of defen-

dant as perpetrator No. 3, who had fired a weapon, was even more likely to be accurate. The prosecutor further exploited the Mendez identification on summation by repeatedly commending Tares, who was able to identify Mendez in a lineup, for his "candor and integrity" in testifying that he was unable to see Mendez at the time of the shooting.

In any event, all of Torosian's testimony on this point was of dubious relevance, since an eyewitness' ability to identify one perpetrator is not necessarily probative of the accuracy of his identification of another. Whatever relevancy this testimony had was far outweighed by the prejudice of its being offered by a witness—not the identifying witness—who could not be cross-examined on the accuracy of the identification.[5] Thus, the method used to introduce the Mendez identification exacerbated its already prejudicial nature. In a one eyewitness case, even with the evidence of the note signed "Mike", the admission of such testimony cannot be deemed harmless.

The People contend that the testimony about the identification of Mendez was admissible because it served to establish Tares' powers of memory and perception, and refute any contention that he could not have observed the events leading up to the shooting. As already noted, the prosecutor put the evidence to far greater use than that. In any event, Tares' cognitive skills could have been established by various other means, including a probing examination of the witness and others about the lighting and sound conditions in the club. Even were the identification of Mendez essential to the People's case, courts must be mindful of their obligation "to strike a neat balance between possible prejudice to the defendant, and the indispensability of the challenged evidence to the People's case; and it goes without saying that any substantial doubt on this score should weight the scales in favor of the defendant." *(People v Stanard,* 32 NY2d 143, 147.) Detective Torosian's bolstering testimony about Tares Figueroa's identification of Mendez was highly prejudicial and should not have been permitted.

Accordingly, the judgment of the Supreme Court, New York County (Edwin Torres, J.), rendered July 6, 1983, convicting defendant of murder in the second degree and sentencing him

---

5. Tares Figueroa himself had mentioned this identification briefly during his direct testimony, but his testimony on this point was extremely limited.

to an indeterminate term of imprisonment of from 20 years to life, should be reversed, on the law, and the matter remanded for a new trial.

ASCH, MILONAS, KASSAL and ELLERIN, JJ., concur.

Judgment, Supreme Court, New York County, rendered on July 6, 1983, unanimously reversed, on the law, and the matter remanded for a new trial.